# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James B. Zagel | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 2883 | **DATE** | 9/7/2001 |
| **CASE TITLE** | WATKINS, ET AL V. UNITED STATES | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]   **Motion for summary judgment is granted/denied in part.**

(11) ■ [For further detail see order attached to the original minute order.]

| | | | Document Number |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | SEP 1 3 2001 | |
| | Notified counsel by telephone. | date docketed | 6 |
| ✓ | Docketing to mail notices. | | |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | FILED FOR DOCKETING 01 SEP 10 PM 9:10 | |
| DW | courtroom deputy's initials | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION



DIANA L. ALINSKY, DURENDA
WALKER, JOHN J. CANTY and NEVIE B.
CANTY, PATRICIA VAN PELT
WATKINS, JERRY PHILLIPS, CARLA
VERTZ, RICHARD POLKA,

Plaintiffs,

v.

UNITED STATES OF AMERICA,

Defendant.

No. 98 C 6189
No. 99 C 1738
No. 99 C 2447
No. 99 C 2883

Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

On July 19, 1997, two aircraft collided in mid-air approximately three miles south of Chicago's Merrill C. Meigs Field, killing all seven occupants. At the time of the crash, both airplanes were in communication with the Meigs Air Traffic Control Tower which was operated by a private company, Midwest Air Traffic Control Services, Inc. ("Midwest"), under contract with the Federal Aviation Administration ("FAA"). Meigs Tower, which was previously staffed by FAA air traffic controllers, had been re-opened under private management in February 1997. Despite numerous indications that Midwest was dangerously short-staffed, a fact that was made known to the FAA months before the accident, only one air traffic controller, Renee Toone, was on duty at the time of the crash. She had been working traffic for four hours without a break, and no supervisor was present. Plaintiffs assert that Ms. Toone was an inexperienced air traffic controller who received inadequate training. The parties agree that she failed to alert the two aircraft of their relative proximity to each other, a failure which caused the collision.



Plaintiffs, administrators of the estates of the seven deceased passengers, sued the United States. In their original Complaint they sought to hold the United States vicariously liable for the negligence of Midwest employees, a theory which they now have abandoned, but which I will nonetheless address in the course of this opinion at the government's request. Plaintiffs' second theory is that the United States is liable for its own employees' negligent acts in administering Midwest's contract. Plaintiffs seek damages under the Federal Tort Claims Act ("FTCA") 28 U.S.C. § 1346(b)(1).

The United States asks me to dismiss the case or, in the alternative, to grant it summary judgment, because it is immune from suit. Since the government's motion necessarily raises facts outside of the allegations in the complaint, I treat it as a motion for summary judgment.

I.

The first issue is by far the easier one to resolve. As a matter of law, the United States may not be held liable for the negligent acts of Midwest, an independent contractor.

The FTCA provides only a limited waiver of the sovereign immunity of the federal government. It grants federal courts jurisdiction over damages claims against the United States "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).

Under the FTCA, the United States has waived its immunity for the negligence of "employees of the government." An employee of the government includes "employees of any federal agency." See 28 U.S.C. § 2671. The term "federal agency" expressly excludes "any contractor with the United States." Id.

To determine whether an entity is a contractor, I must consider whether the federal government exercises day-to-day supervisory control over the entity and its employees. *See United States v. Orleans*, 425 U.S. 807, 815 (1976). Relevant considerations are whether the entity is an independent corporation, whether the government has the right to hire and fire employees, and whether the government is involved in the entity's finances. *See Peoples Gas Light & Coke Co. v. United States*, 1990 WL 129359 *4 (ND. Ill. 1990).

Willie Card's affidavit (which is essentially unrebutted by plaintiffs) coupled with plaintiffs' own characterization of Midwest's contractual relationship with the FAA clearly establish that the FAA does not control the day-to-day operation of Meigs Tower.[1] Midwest is an independent corporation headquartered in Kansas. It decides when to hire and fire employees. It sets its controllers' salaries and decides their benefits. The FAA has no control over Midwest's finances. Moreover, after an initial start-up period, the FAA gave Midwest complete dominion over training and quality assurance initiatives. Plaintiffs point out that under Midwest's contract the FAA retained power to designate hours of operation, set the qualifications of Midwest's workers, choose the type of equipment used, and fire any of its employees. The fact that the FAA had a certain amount of oversight over Midwest does nothing to dispute the government's assertion that day-to-day management of the Meigs Field Air Tower rested entirely with Midwest.

---

[1] Willie Card is the Manager of the FAA's Air Traffic Operations Program.

3

Midwest is quite clearly a contractor within the meaning of 28 U.S.C. § 2671. As such, the negligence of its employees is no basis upon which to hold the United States vicariously liable.[2]

II.

The next question before me is one of first impression. Can the United States be held liable for the negligent administration of a contract with a private air traffic controller? Plaintiffs allege that the FAA approved a privatization plan according to which too few air traffic controllers worked at Meigs Tower, failed to ensure that Midwest's staff were properly trained, and disregarded numerous indications that the staff shortage at Meigs Tower posed an imminent threat to the safety of those who used the airport.

Some background facts are in order. The FAA approved a staff of three controllers and one supervisor to work traffic at Meigs Tower–three fewer controllers than the FAA used when it operated the tower. It soon became clear to Midwest that its staffing levels were insufficient. Its contract required it to seek approval from the FAA for additional personnel, and it did so on April 18, 1997. In its letter to the FAA, Midwest sought increased staffing "as soon as possible," explaining that actual traffic counts were 21% more than predicted counts, and that it anticipated

---

[2] Plaintiffs argue in the alternative that, even assuming Midwest was not within the control of the FAA, the United States is nonetheless liable because under Illinois law one who conducts inherently dangerous activities has a nondelegable duty to take steps to ensure that adequate safety procedures are in place. While the Seventh Circuit has not yet spoken on whether the nondelegable duty doctrine may be applied to the United States in an FTCA action, in my view the Supreme Court effectively precluded this approach in *Logue v. United States*, 412 U.S. 521, 528 (1973)("Congress, of course, could have left the determination as to whose negligence the Government should be liable for under the Federal Tort Claims Act to the law of the State involved, as it did with other aspects of liability under the Act. But it chose not to do this, and instead incorporated into the definitions of the Act the exemption from liability for injury caused by employees of a contractor. While this congressional choice leaves the courts free to look to the law of torts and agency to define 'contractor,' it does not leave them free to abrogate the exemption that the Act provides."). *See also Roditis v. United States*, 122 F.3d 108, 111 (2d Cir. 1997)("in adopting the independent contractor exception to liability, Congress did not simultaneously adopt the exceptions to that doctrine.").

4

a heavy volume of aircraft during the coming summer months.³ Approval for an additional controller was not given until some three months after Midwest's request. In the meantime, the FAA hired one of Midwest's air traffic controllers away from it, reducing staffing levels at Midwest to two controllers and one manager to operate a tower that was open seven days per week from 6 a.m. until 10 p.m.

There were other indications of trouble ahead. On June 17, 1997, an FAA air traffic controller from the Chicago Terminal Radar Approach Control in Elgin, Illinois ("Elgin TRACON") filed an Unsatisfactory Condition Report (UCR) in which he alerted the FAA to his concern that under-staffing at Meigs would "lead to an accident or midair." Contrary to established procedure (so plaintiffs say), the TRACON facility manager returned the report to the controller who wrote it, with a note stating that "the UCR process is not the correct vehicle in which to pursue this concern." Then on July 3, 1997, two weeks before the collision which caused the seven fatalities in this case, the *Chicago Tribune* published a feature article entitled "Meigs Traffic Boom Brings Safety Fears." Still, no additional controller was approved until July 11, 1997.⁴ No new controller had been hired at the time of the collision.

The United States does not deny plaintiffs' factual allegations, but rather argues that any alleged negligent oversight falls within the discretionary function exception to the FTCA, 28 U.S.C. § 2680(a), requiring dismissal of the claim. An exception to the waiver of immunity contained in the FTCA is that no liability shall lie for claims "based upon the exercise or

---

³If I am to credit a *Chicago Tribune* article appended to plaintiffs' brief, at peak times during summer months more than 100 aircraft per hour landed at Meigs Field in 1997.

⁴Informal verbal authorization for an additional controller was given by FAA employee Constance Brown on July 8, 1997.

performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." *Id.* Where this exception applies, a federal court must dismiss the case for lack of subject matter jurisdiction.

Whether the discretionary function exception bars suit against the United States depends upon two factors. *See Berkovitz v. United States*, 108 S. Ct. 1954 (1988); *Calderon v. United States*, 123 F.3d 947, 949 (7th Cir. 1997). The first is whether government employees violated a specific mandatory statute, regulation or policy. For if a directive with the force of law specifically prescribes a course of action for an employee to follow and the employee does not follow the prescribed course, the exception does not apply. *Calderon*, 123 F.3d at 949. The second is whether the conduct involved was the type of conduct that Congress intended to shield from liability. The exception protects only governmental actions based upon considerations of public policy.

The United States bears the burden of showing that the discretionary function exception applies. See *GATX Airlog Co. v. United States*, 234 F.3d 1089 (9th Cir. 2000). I find that the government has not met its burden here. The discretionary function exception applies to some, but not all, of the conduct alleged by plaintiffs.

A.

Plaintiffs claim that the FAA overstepped the bounds of the following mandatory FAA Orders:

**FAA Order 7210.3** governs watch coverage at air traffic control towers. At the heart of plaintiffs' case is Section 5: 2-5-2(a) of Order 7210.3 which provides that "efficient AT [air

6

traffic] services require supervision of each watch regardless of the number of persons assigned." A further provision states that supervisors, prior to being designated as such, must be "facility rated" for six months and have completed certain training courses. Plaintiffs interpret this order to mean that an FAA air traffic controller who does not qualify as a supervisor may not stand watch alone. The United States does not dispute this interpretation, so I accept it for purposes of this motion. Had Renee Toone been an FAA employee, the staffing arrangements on the day of the accident would have been in violation of Order 7210.3 and the discretionary function exception would not apply.[5]

Of course, Ms. Toone was not an FAA employee, and I have already established that the FAA cannot be vicariously liable for the negligent acts of its contractor. Neither can the FAA be held responsible for merely failing to monitor Midwest's compliance with safety or staffing standards. See *United States v. Varig Airlines*, 104 S. Ct. 2755, 2768 (1984); *Kirchmann v. U.S.*, 8 F.3d 1273, 1276 (8th Cir. 1993). It is the United States' position, then, that whether or not Midwest breached a mandatory order, the FAA had nothing to do with it. Here is where I disagree. By the terms of its contract with Midwest, the FAA had the *sole* power to approve the

---

[5] Where an FAA Order merely sets forth a general policy statement or a recommendation it will not be considered a mandatory and specific directive having the force and effect of law. See *GATX/Airlog Co. v. Evergreen Airlines, Inc.*, 81 F. Supp. 2d 1003, 1006-7 (N.D. Cal. 1999); *Conrad v. Tokyo Aircraft Instrument Co.*, 988 F. Supp. 1227 (W.D. Wisc. 1997). But where an FAA Order mandates particularized conduct, the FAA's actions are not discretionary. See *Barna v. U.S.*, 22 F.Supp.2d 784 (N.D. Ill. 1998); *AIG Aviation Insurance Services, Inc. v.* 885 F.Supp. 1496, 1499 (D. Utah 1995). In this case, the word "requires" in FAA Order 7210.3 weighs against a finding that the FAA has discretion as to whether air traffic controllers not meeting certain minimum qualifications must be supervised. Certainly a reasonable argument to the contrary could be made, but none was made by the government in this case.

hiring of additional controllers. If plaintiffs' account is correct (and again, it is essentially undisputed by the government), the FAA effectively prevented Midwest from coming into conformity with FAA Order 7210.3 by delaying approval of additional controllers for a period of three months. The United States cannot very well hide behind the shield of the discretionary function exception and the independent contractor rule if the FAA was itself the cause of its contractor's inability to conform with a specific and mandatory FAA Order. I note that the government states that it followed established procedure in processing the request for additional staff, but the record contains no hint of what those procedures were or support for the assertion that such procedures were followed.

**FAA Order 7210.54** governs the on-the-job training for air traffic controllers employed by independent contractors like Midwest. It provides that during a contractor's initial phase-in period, certified FAA training instructors shall provide training for contractor personnel. Doreen Adams, the Midwest facility manager and an FAA employee, provided some initial training to three Midwest employees, and entrusted Midwest with all further training of its personnel. Plaintiffs argue that Midwest provided inadequate training and that, as a result, Ms. Toone, a military controller who had no experience with traffic transversing Class D airspace and who had not worked traffic for six years, did not receive the facility-specific training the FAA's own directives require. This may be true, but the FAA's decision to vest training responsibility in its independent contractor was permissible under the contract and under Order 7210.54. Moreover, the FAA did nothing to prevent Midwest from training its employees.

There is one aspect of plaintiffs' negligent training argument, however, that survives the discretionary function analysis, and that is its allegation that Ms. Adams was an unqualified

instructor. Ms. Adams confirmed in deposition that she was not tested and worked no traffic before receiving her facility rating, in violation of Federal Aviation Regulation 65.37, which requires a control operator to pass a practical test on assorted skills particular to the facility.

For future reference, I note that plaintiffs may have difficulty showing that Ms. Adams' allegedly deficient training was the actual and proximate cause of the deaths in this case.

B.

Even in the absence of specific mandatory orders which prescribe the course of FAA employees' conduct, I find that certain of the FAA's alleged actions fall outside the discretionary function exception because they are not susceptible to policy analysis.

In an effort to convince me otherwise, the United States provides me with a legislative history of the decision to privatize certain control towers. In particular, the record indicates that the movement to privatize began during the Reagan administration when the FAA closed 80 towers in response to the air traffic controllers' strike in 1981. Then in 1984, the FAA developed the Level I VFR Airport Traffic Control Tower Program, the purpose of which was to contract for services at a number of towers that remained closed after the strike. In 1993, Vice President Gore's "Report of the National Performance Review" recommended converting 99 more low-activity towers to contract operations. Congressional debate on the issue has emphasized the significant savings that are to be had by placing low-activity control towers in the contract program.

Clearly, the decision to privatize low-activity air traffic control towers was grounded in political and economic concerns susceptible to policy analysis. It does not follow, however, that any act by FAA employees in connection with the privatization of the industry is immunized.

9

Such an interpretation would preclude liability for any and all acts arising out of the regulatory programs of federal agencies.[6] The relevant government action was not the decision to privatize Meigs Tower, but rather the decision to delay the hiring of new controllers in the face of an allegedly imminent threat of harm to the flying public. On the record before me, I cannot say that either the delay in responding to complaints about under-staffing or the decision to have an unqualified instructor train Midwest's staff constitutes conduct grounded in policy considerations. Consequently, I find that the discretionary function exception does not apply and that I have subject matter jurisdiction over this action.[7]

III.

As an alternative theory, plaintiffs allege that air traffic controllers at Midway Tower and the Elgin TRACON facility (both FAA controlled towers) were responsible for the accident. These allegations are without factual support in the record. It is not enough, at this point, for plaintiffs to state conclusorily that the aircraft in question were depicted on radar and that FAA controllers saw or should have seen that the courses of the aircraft would lead to collision. This is especially true since the pilots of the two planes involved were in "Class D" airspace assigned to Meigs and were not in communication with, nor receiving air traffic control services from either FAA-controlled tower. Plaintiffs have virtually nothing to say in response to the line of cases that hold that air traffic controllers have no duty to provide services to aircraft operating in another facility's airspace. To the extent that plaintiffs challenge the FAA's design of the

---

[6]See *Coulthurst v. United States*, 214 F.3d 106 (2d Cir. 2000)(holding that courts are not to interpret the discretionary function exception to immunize every government act); *Sexton v. United States*, 132 F. Supp. 967 (M.D. Fla. 2000)(same).

[7]In reaching these conclusions, I give no weight to the affidavit, submitted with plaintiff's supplemental brief, of R.P. "Pete" Burdess, a former FAA controller and manager. The affidavit contains little more than Mr. Burdess's legal conclusions about the applicability of certain FAA Orders to the case at hand.

10

airspace and air traffic control system, plaintiffs' allegations must be dismissed under the discretionary function exception to the FTCA.

IV.

On this record, the United States' motion for summary judgment is granted in part and denied in part.

ENTER:

*James B. Zagel*
James B. Zagel
United States District Judge

DATE: SEP 7 2001